UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/10/2025
```

NEXTERA ENERGY MARKETING, LLC,

                    Plaintiff,

        - against -

MACQUARIE ENERGY LLC,

                    Defendant.

────────────────────────

MACQUARIE ENERGY LLC,

                    Counterclaimant,

        - against -

NEXTERA ENERGY MARKETING, LLC,

                    Counterclaim
                    Defendant.

**22 Civ. 1345 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

    Plaintiff NextEra Energy Marketing, LLC ("NextEra") brought this action against defendant Macquarie Energy LLC ("Macquarie"), alleging breach of contract. The dispute stems from Macquarie's alleged failure to deliver the parties' contracted amount of natural gas at certain delivery points in Oklahoma during Winter Storm Uri (the "Storm") in February 2021. (See "Compl.," Dkt. No. 1.) Macquarie answered the Complaint and asserted a counterclaim for breach of contract (the "Counterclaim"). Macquarie claims that NextEra failed to deliver the contracted amount of natural gas at certain

1

delivery points in Oklahoma and Texas during the Storm. (See "Answer & Counterclaim," Dkt No. 22.)

Now pending before the Court is Macquarie's motion for summary judgment and NextEra's motion for partial summary judgment, which are focused on the parties' contracted natural gas deliveries in Oklahoma.[1] (See "Macquarie Mot.," Dkt. No. 118; "NextEra Mot.," Dkt. No. 125.) NextEra and Macquarie both concede that they respectively underdelivered the contracted amount of gas in Oklahoma during the Storm, but each party maintains that its underperformance was excused by the Storm as a force majeure. As further explained below, there are numerous disputes of material fact that preclude summary judgment on liability for both parties. Nonetheless, Macquarie's motion for summary judgment is granted on the narrow issue of damages for February 19, 2021 (Gas Day 19) because Macquarie has shown that there is no evidence to support NextEra's requested damages on that day. Accordingly, NextEra's motion for partial summary judgment is **DENIED** and Macquarie's motion for summary judgment is **DENIED IN PART** and **GRANTED IN PART**.

---

[1] NextEra does not move for summary judgment on the portion of Macquarie's Counterclaim concerning NextEra's delivery obligations in Texas but reserves its right to invoke a force majeure defense at trial. (See "NextEra Mem.," Dkt. No. 130 at 2 n.1.)

# I.   BACKGROUND[2]

## A.   THE AGREEMENT

NextEra and Macquarie are both energy marketing and trading entities that buy and sell natural gas. (See "NextEra SOMF," Dkt. No. 131 ¶¶ 1-4; "Macquarie SOMF," Dkt. No. 120 ¶ 1.) On December 17, 2009, the parties entered into an umbrella agreement (the "Agreement") for the sale and purchase of natural gas. The transaction is governed by New York law. (See NextEra SOMF ¶¶ 27, 30; Macquarie SOMF ¶ 2.) The Agreement consists of four documents: (1) a standard master agreement published by the International Swaps and Derivatives Association (the "Master Agreement"), (2) a schedule to the Master Agreement (the "Schedule"), (3) a North American gas annex (the "Gas Annex"), and (4) a 2009 amendment addendum to the Gas Annex (the "Gas Annex Addendum," and collectively, the "Agreement"). (See "Master Agreement," Dkt. No. 121-1 at 2-20; "Schedule," Dkt. No. 121-1 at 21-35; "Gas

---

[2] This Decision and Order discusses portions of the parties' briefs, statements of material fact, and supporting exhibits that were filed under seal or redacted. (See Dkt. Nos. 133, 149, 164 (granting the parties' unopposed motions to seal).) To the extent that the Court discloses information from those sealed materials in this Decision and Order, the business and privacy interests that justified their sealing or redaction are outweighed by "the public's right of access to [information] necessary to understanding the basis for court rulings." SEC v. Ripple Labs, Inc., 682 F. Supp. 3d 308, 316 n.1 (S.D.N.Y. 2023) (quoting Spinelli v. National Football League, 903 F.3d 185, 193 n.2 (2d Cir. 2018)). Accordingly, the Court does not place any part of this Decision and Order under seal. See Columbus McKinnon Corp. v. Travelers Indem. Co., 367 F. Supp. 3d 123, 140 (S.D.N.Y. 2018).

Annex," Dkt. No. 121-2; "Gas Annex Addendum," Dkt. No. 121-3.[3]) The Agreement is a long-term base contract for natural gas transactions between the parties, which were separately memorialized in short form "transaction confirmations" that specified the price, quantity, delivery points, and performance obligations for specific transactions of natural gas. (See NextEra SOMF ¶ 31; Macquarie SOMF ¶ 2.)

The transaction confirmations at issue involved two pipeline systems:[4] (1) the ONEOK Gas Transportation, LLC ("OGT") Pipeline, and (2) the Enable Gas Transmission, LLC ("EGT") Pipeline. (See NextEra SOMF ¶¶ 5, 7.) The relevant delivery locations – known as pools[5] – for these respective pipelines were (1) the OGT Pool, located in Oklahoma, and (2) the EGT Pool, also located in Oklahoma. (See id. ¶¶ 6, 8; Macquarie SOMF ¶¶ 6-7.)

Regarding deliveries at the EGT Pool, NextEra agreed to sell Macquarie up to 34,000 MMBtu[6] each day of February 2021,

---

[3] Unless specified otherwise, the Court's citations to the parties' supporting exhibits refer to the ECF page numbers.

[4] A pipeline system is responsible for effectuating the delivery of physical natural gas to counterparties by moving gas from receipt locations to delivery locations. (See Macquarie SOMF ¶ 12.)

[5] A pool is a collection of physical delivery points that are treated as one virtual delivery point. (See NextEra SOMF ¶ 9.)

[6] "MMBtu" is the abbreviation for one million British thermal units, which is a unit of measurement for natural gas. (See Compl. ¶ 1 n.1; Gas Annex, Clause (k)(xv).) One MMBtu is equivalent to one dekatherm ("Dth"). (See Gas Annex, Clause (k)(xv).)

with the first 20,000 MMBtu priced on a First-of-Month ("FOM") index, plus a negotiated spread, and the remaining 14,000 MMBtu at the rate designated by the daily gas price. (See Macquarie SOMF ¶ 10; NextEra SOMF ¶¶ 51-54.)

Regarding deliveries at the OGT Pool, the parties initially agreed for Macquarie to sell NextEra 30,000 MMBtu per day from November 1, 2020, through March 31, 2021, priced at FOM, plus a negotiated spread. (See Macquarie SOMF ¶ 8; NextEra SOMF ¶ 46.) The parties subsequently agreed for NextEra to sell 5,000 MMBtu to Macquarie at the OGT Pool, known as a "buyback" or a "bookout," during the entire month of February 2021. (See NextEra SOMF ¶¶ 47-48.) As result of the buyback transaction, the parties frequently nominated a net quantity of 25,000 MMBtu at the OGT Pool, instead of entering separate nominations for 30,0000 MMBtu (Macquarie's contracted volume to NextEra) and 5,000 MMBtu (NextEra's contracted volume to Macquarie). (See id. ¶ 48.)

The transaction confirmations for the OGT and EGT Pools were executed on a "firm" basis, meaning that a party would be liable for a breach unless "performance [was] prevented for reasons of Force Majeure." (Id. ¶ 32 (quoting Gas Annex, Clause (k)(xi)).) The Agreement defines Force Majeure as "any cause not reasonably within the control of the party claiming suspension," including "storms or storm warnings," "weather

related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe," and "governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction." (Gas Annex, Clause (h)(i)-(ii).)

The Force Majeure clause requires each party to "make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance." (Gas Annex, Clause (h)(ii).) Further, the Agreement requires the party whose performance was impacted by the Force Majeure to provide written notice as soon as reasonably possible. (See NextEra SOMF ¶¶ 61, 65; Gas Annex, Clause (h)(v).) Upon providing written notice, the affected party "will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas . . . to the extent and for the duration of the Force Majeure." (Gas Annex, Clause (h)(v).) The Agreement also provides that "neither party shall be deemed to have failed in such obligations to the other during such occurrence or event." (Id.)

If a party's performance was not prevented by Force Majeure, the Agreement provides for "spot" and "cover"

damages for an unexcused failure to receive or deliver the contracted amount of gas. Cover damages are available if a buyer purchased more expensive gas on the market to replace the gas that the seller failed to deliver. (See Gas Annex Addendum, Clause (b).) Spot damages are available if a buyer "used commercially reasonable efforts to replace the Gas" that the seller failed to deliver, but no replacement gas was available at the time at issue here. (Id.) The Agreement also provides calculation methods for both types of damages. (See id.)

> B.    OTHER RELEVANT INDUSTRY TERMS

The Court briefly addresses other industry terms that are relevant to understanding the parties' claims. Through a process known as scheduling, counterparties (such as NextEra and Macquarie) provide a pipeline company with nominations. (See Macquarie SOMF ¶ 12.) Nominations are instructions to a pipeline to transport gas between a receipt and delivery point and include the volume of gas to be transported and the Gas Day nomination cycle. (See id.; NextEra SOMF ¶¶ 40-42.) A Gas Day, which is not synonymous with a calendar day, is a twenty-four-hour period that begins at 9:00 AM and ends at 9:00 AM

the following day.[7] (See NextEra SOMF ¶ 39.) For each Gas
Day, there are five cycles – commonly known as nomination
cycles - for which a party may enter nominations. (See
Macquarie SOMF ¶ 16.) Generally, the final cycle of the Gas
Day establishes the amount of gas delivered on that Gas Day.
(See NextEra SOMF ¶ 44.)

Nominations also include a ranking of counterparties,
which determines the priority of gas flow in case of a
shortage. (See id. ¶ 42; Macquarie SOMF ¶ 12.) A party may
adjust its rankings of counterparties for each nomination
cycle. (See NextEra SOMF ¶¶ 40-42.) A lower numerical rank
(1) is associated with a higher priority and a higher
numerical rank (999) is associated with a lower priority.
(See id. ¶ 43.) Where there is an insufficient amount of gas
to fulfill a nomination, the pipeline company may reduce the
scheduled volume and allocate available gas proportionally
between counterparties of the same rank. (See Macquarie SOMF
¶ 12.) As a result, parties with a lower priority ranking are
less likely to receive gas in light of a shortage. Here, the
parties did not negotiate any special provision regarding

---

[7] In their briefing, the parties frequently interchange Gas Days and
calendar days. For the sake of clarity, the Court adopts the same
references to Gas Days and calendar days that are used by the parties.

rankings or allocations of limited gas supply during a Force
Majeure event. (See id. ¶¶ 13-14.)

C.    WINTER STORM URI AND THE PARTIES' RESPONSES

Between February 8 and February 22, 2021, a cold front
moved through the southern and central regions of the United
States. It developed into an unprecedented winter storm known
as Winter Storm Uri. (See Macquarie SOMF ¶ 17.) As the Storm
pummeled Oklahoma and neighboring states with extremely low
temperatures, Oklahoma Governor J. Kevin Stitt ("Governor
Stitt") issued Executive Order 2021-06 ("Executive Order
2021-06"), which declared a state of emergency in Oklahoma
and recognized that the severe weather was expected to cause
damage to utilities, including electric, gas, and water
systems in Oklahoma. (See NextEra SOMF ¶ 94.[8]) President
Joseph R. Biden ("President Biden") subsequently recognized
a state of emergency in Oklahoma and ordered federal
assistance to support disaster relief efforts in Oklahoma
(the "Federal Declaration"). (See id. ¶ 98.[9])

---

[8] (See also Oklahoma Executive Order 2021-06, Federal Motor Carrier Safety
Administration (Feb. 12, 2021), https://www.fmcsa.dot.gov/emergency/
oklahoma-executive-order-2021-06 [hereafter "Exec. Order 2021-06"].)

[9] (See Press Release, The White House, President Joseph R. Biden, Jr.
Approves Oklahoma Emergency Declaration (Feb. 18, 2021),
https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/
2021/02/18/president-joseph-r-biden-jr-approves-oklahoma-emergency-
declaration/ [hereafter "Fed. Decl."].)

As relevant to this action, the freezing temperatures during the Storm caused unplanned outages and widespread disruption of natural gas production, as well as the ability to gather, process, and transport natural gas throughout the impacted regions. (See id. ¶¶ 81-82, 86.) Natural gas production was most severely disrupted in Texas, Oklahoma and Louisiana, (see id. ¶ 84), and in Oklahoma, natural gas production declined by approximately fifty-seven percent. (See id. ¶ 85.) Given the constraints on supply, gas prices in Oklahoma drastically increased during the Storm. (See id. ¶¶ 88-93.) For example, at the EGT Pool, daily gas prices rose from $3.50 per MMBtu on February 10, 2021, to a peak of $428.64 per MMBtu on February 18, 2021. (See id. ¶¶ 92-93; NextEra Mem. at 7.) And at the OGT Pool, gas prices rose to an average of $1,192 per MMBtu on Gas Day 18, the highest price in the country. (See NextEra SOMF ¶¶ 90-91.)

The parties issued several Force Majeure notices during the Storm. On February 14, 2021, NextEra declared Force Majeure under the Agreement to excuse its obligations to receive and deliver gas in Louisiana, Oklahoma, and Texas. (See Macquarie SOMF ¶¶ 25-26; NextEra SOMF ¶¶ 66-67; see also "NextEra Feb. 14 FM Notice (OGT)," Dkt. No. 128-12; "NextEra Feb. 14 FM Notice (EGT)," Dkt. No. 128-17.) Citing severe weather conditions, NextEra stated in the Force Majeure

letters that it may be unable to deliver or receive gas and that it would not pay any corresponding damages. (See NextEra Feb. 14 FM Notice (OGT); NextEra Feb. 14 FM Notice (EGT).) On February 15, 2021, Macquarie informed NextEra via the Intercontinental Exchange ("ICE") chat platform that Macquarie was declaring Force Majeure at the OGT Pool. (See Macquarie SOMF ¶ 27; NextEra SOMF ¶ 76.) On February 16, 2021, NextEra sent Macquarie an updated Force Majeure notice, which extended its Force Majeure declaration to other states in the region and reiterated that NextEra would not pay damages in the event that NextEra was unable to receive or deliver gas. (See NextEra SOMF ¶¶ 68-69; "NextEra Feb. 16 FM Notice," Dkt. No. 128-18.) On February 18, 2021, Macquarie issued a Force Majeure notice for the OGT Pool, stating that widespread and unprecedented weather events had caused "freeze-offs and power outages that have curtailed and interrupted a majority of the natural gas supply" and had impacted Macquarie's delivery capabilities at the OGT Pool. ("Macquarie Feb. 18 FM Notice (OGT)," Dkt. No. 121-33; NextEra SOMF ¶ 80.)

During the Storm, both parties lost substantial gas supply and each failed to meet their respective delivery obligations in Oklahoma, as Macquarie failed to deliver more than 110,000 MMBtu to NextEra and NextEra failed to deliver at least 120,000 MMBtu to Macquarie. (See Macquarie SOMF

¶¶ 34-38; NextEra SOMF ¶ 50.) NextEra subsequently invoiced Macquarie for contract-specified damages, which Macquarie refused to pay. (See Compl. ¶ 18; Dkt. No. 27 at 1.)

On February 16, 2022, NextEra filed this action against Macquarie, alleging breach of contract. (See generally Compl.) On March 25, 2022, Macquarie answered the Complaint and filed its Counterclaim for breach of contract. (See Answer & Counterclaim.) NextEra answered the Counterclaim on April 15, 2022. (See Dkt. No. 24.) Following a lengthy discovery period, (see Dkt. Nos. 30, 115), the parties filed their cross-motions for summary judgment on February 14, 2025. (See NextEra Mot.; Macquarie Mot.) The motions are now fully briefed and ripe for decision.

## II.  **LEGAL STANDARDS**

### A.   SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 ("Rule 56") provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the district court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir.

2021) (quoting <u>Lucente v. County of Suffolk</u>, 980 F.3d 284, 296 (2d Cir. 2020)). "When a court must decide cross-motions for summary judgment, it must analyze each party's motion 'on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" <u>Phillies v. Harrison/Erickson</u>, No. 19 Civ. 7239, 2021 WL 5936523, at *9 (S.D.N.Y. Aug. 10, 2021) (quoting <u>Morales v. Quintel Ent., Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001)).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact." <u>New York v. Mountain Tobacco Co.</u>, 942 F.3d 536, 541 (2d Cir. 2019) (quoting <u>Smith v. Barnesandnoble.com, LLC</u>, 839 F.3d 163, 166 (2d Cir. 2016)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" <u>Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC</u>, 13 F.4th 247, 259 (2d Cir. 2021) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247–48. In turn, a party opposing summary judgment "must provide more than conclusory allegations," <u>Gorzynski v. JetBlue Airways, Corp.</u>, 596 F.3d

13

93, 101 (2d Cir. 2010), and must support its position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B).

However, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kee, 12 F.4th at 166-67 (quoting Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010)). Thus, summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. See id. at 158.

B.  BREACH OF CONTRACT

Under New York law, a breach of contract claim has four elements: (1) the existence of a contract, (2) the plaintiff's

adequate performance of the contract, (3) the defendant's
breach of the contract, and (4) resulting damages. See Alpha
Cap. Anstalt v. Real Goods Solar, Inc., 311 F. Supp. 3d 623,
628 (S.D.N.Y. 2018). In interpreting the contract, a district
court must "give a fair and reasonable meaning to the language
used." Hughes Commc'ns India Priv. Ltd. v. DirecTV Grp., Inc.,
71 F.4th 141, 153 (2d Cir. 2023) (citation omitted).

In a contract dispute, the "initial question for the
court on a motion for summary judgment . . . is whether the
contract is unambiguous with respect to the question disputed
by the parties." Law Debenture Trust Co. of N.Y. v. Maverick
Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) (citation
omitted); Phibro Energy, Inc. v. Empresa De Polimeros De Sines
Sarl, 720 F. Supp. 312, 321 (S.D.N.Y. 1989) ("The
determination of whether a contract term or clause is
ambiguous," such as a force majeure clause, "is a threshold
question of law for the Court"). If the contract language is
unambiguous, and reasonable persons could not differ as to
its meaning, the interpretation of the contract is a question
of law for the court. See Rothenberg v. Lincoln Farm Camp,
Inc., 755 F.2d 1017, 1019 (2d Cir. 1985). "Where the terms of
a contract are clear, the court may properly grant summary
judgment as a matter of law." AEP Energy Servs. Gas Holding

_Co. v. Bank of Am., N.A._, 626 F.3d 699, 729 n.15 (2d Cir. 2010).

On the other hand, "[w]hen the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." _Alpha Cap. Anstalt_, 311 F. Supp. 3d at 628–29 (quoting _Van Etten Oil Co., Inc. v. Aero Star Petroleum, Inc._, 14 N.Y.S. 3d 801, 803 (App. Div. 3d Dep't 2015)). "A contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." _AEP Energy_, 626 F.3d at 729 n.14 (citation omitted). However, that the parties interpret a contract provision differently does not necessarily make the provision ambiguous. _See_ _Volt Elec. N.Y.C. Corp. v. A.M.E., Inc._, 586 F. Supp. 3d 262, 276 (S.D.N.Y. 2022).

C.  FORCE MAJEURE

"The basic purpose of a force majeure clause is to 'relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated.'" _Phibro Energy, Inc._, 720 F. Supp. at 318 (quoting _Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd._, 782 F.2d 314, 319 (2d Cir. 1985)); _PT Kaltim Prima Coal v. AES Barbers_

Point, Inc., 180 F. Supp. 2d 475, 482 (S.D.N.Y. 2001) ("A declaration of force majeure relieves both seller and buyer of their contractual obligations."). "The burden of demonstrating force majeure is on the party seeking to have its performance excused" under the contract. Phillips, 720 F.2d at 319.

Under New York law, non-performance based on force majeure is excusable "only if the force majeure clause specifically includes the event that actually prevents a party's performance." Kel Kim Corp. v. Central Mkts., Inc., 519 N.E.2d 295, 296 (N.Y. 1987). "[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." JN Contemp. Art LLC v. Phillips Auctioneers LLC, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted).

Further, "[i]t is well-established that in order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract." Kosher Ski Tours Inc. v. Okemo Ltd. Liab. Co., No. 20 Civ. 9815, 2023 WL 8720273, at *5 (S.D.N.Y. Dec. 18, 2023) (citation omitted); see also 22A N.Y. Jur. 2d Contracts § 386 (2025) ("To relieve a party from liability for nonperformance based on such a clause, the excuse pleaded must also be the proximate cause

of the failure to perform."). Moreover, the party invoking the force majeure doctrine "must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constitute[s] force majeure." Phillips, 782 F.2d at 319.

### III. DISCUSSION

The central dispute in the parties' competing motions for summary judgment is whether the Agreement's Force Majeure clause excused each party's failure to deliver the contracted volumes of gas during the Storm.[10] Both parties invoke the force majeure doctrine as an affirmative defense in their respective summary judgment motions. Further, both parties argue that the Force Majeure clause does not excuse their counterparty's failure to perform under the Agreement. The parties do not dispute that (1) the Storm was a Force Majeure under the Agreement, (2) the parties' respective Force Majeure notices were valid under the Agreement, (3) the parties each had diminished gas supply during the Storm, and (4) the parties failed to deliver the full amount of contracted gas to each other during the Storm. (See Macquarie

---

[10] It is undisputed that NextEra and Macquarie are parties to the Agreement and that the Agreement is governed by New York law. (See NextEra SOMF ¶¶ 27, 30; Macquarie SOMF ¶ 2.)

SOMF ¶¶ 21-23, 28, 34-37; NextEra SOMF ¶¶ 85-86, 93, 231, 233-34; Macquarie Mem. at 1; NextEra Mem. at 23.)

Thus, whether a party's performance is excused under the Agreement's Force Majeure clause turns on whether the party allocated its available gas in a manner that was fair and reasonable during the Storm. (See Gas Annex, Clause (h)(ii) (requiring each party to "make reasonable efforts to avoid the adverse impacts of a Force Majeure").) See, e.g., LNG Ams., Inc. v. Chevron Nat. Gas, No. 21 Civ. 2226, 2023 WL 2920940, at *10 (S.D. Tex. Apr. 12, 2023) ("Absent a contractual promise of priority, the seller's obligation during a valid force majeure event is to provide a 'fair and reasonable' allocation of the available gas."). The Court first addresses NextEra's motion for partial summary judgment before turning to Macquarie's motion for summary judgment.

A.    NEXTERA'S MOTION FOR SUMMARY JUDGMENT

NextEra seeks summary judgment on its breach of contract claim, which alleges that Macquarie failed to meet its delivery obligations during the Storm, which are not excused by the Agreement's Force Majeure clause. Further, NextEra maintains that it permissibly allocated its limited gas supply to counterparties who were serving human needs, and thus its limited deliveries to Macquarie at the EGT and OGT Pools were fair and reasonable because Macquarie was not

supplying gas to human needs counterparties during the Storm. (See NextEra Mem. at 23-27.) The Court first addresses Macquarie's performance before turning to NextEra's performance during the Storm.

1. <u>Macquarie's Performance</u>

NextEra argues that there is no genuine dispute of material fact that Macquarie breached the Agreement by underdelivering the contracted amount of natural gas to NextEra at the OGT Pool during the Storm. (See NextEra Mem. at 13-14; NextEra SOMF ¶ 50.) Further, NextEra insists that Macquarie forfeited a contractual Force Majeure excuse because Macquarie's conduct was unreasonable on two grounds: (1) Macquarie retaliated against NextEra at the OGT Pool for NextEra's underperformance at the EGT Pool, and (2) Macquarie improperly took advantage of the skyrocketing gas prices during the Storm and prioritized highly profitable transactions on the open market rather than honoring its lower-priced transaction confirmations with NextEra. (See NextEra Mem. at 16-23.)

As the moving party, NextEra bears the initial burden to show that there is no genuine dispute of material fact that Macquarie's conduct was unreasonable. See FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994). "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal

20

sufficiency of an affirmative defense - on which the defendant bears the burden of proof at trial - a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case." Id. (citations omitted); see also J.P. Morgan Ventures Energy Corp. v. Miami Wind I, LLC, 179 N.Y.S.3d 892, 2022 WL 17957452, at *7 (N.Y. Sup. Ct. 2022) ("It is ultimately the Sellers' burden to demonstrate force majeure . . . [b]ut, on the Buyer's motion for summary judgment, the Buyer has the initial burden of eliminating questions of fact."). "Conversely, if an affirmative defense is supported by evidence from which a reasonable jury could find the defense applicable, then summary judgment must be denied." Smith v. Interstate Mgmt. Co. LLC, No. 20 Civ. 10867, 2022 WL 4537947, at *9 (S.D.N.Y. Sept. 28, 2022).

a.  *Retaliation Theory*

The following events are not genuinely disputed. During the early days of the Storm, NextEra began experiencing a loss in its upstream gas supply. In light of those shortages, by February 14, 2021, NextEra began cutting deliveries to its downstream counterparties, on a *pro rata* basis, at both the OGT and EGT Pools. (See NextEra SOMF ¶¶ 147, 231, 233.) At the EGT Pool, NextEra delivered seventy-six percent of Macquarie's nominated volumes for Gas Day 14. (See id. ¶ 149.)

Also on February 14, 2021, NextEra sent Macquarie Force Majeure notices for the OGT and EGT Pools, indicating that NextEra would potentially be unable to deliver or receive gas while the Storm was ongoing, and that NextEra would not pay any damages for its failure to receive or deliver gas. (See NextEra Feb. 14 FM Notice (OGT); NextEra Feb. 14 FM Notice (EGT).) At the time of NextEra's Force Majeure notices, Macquarie's standing instruction at the OGT Pool was to allocate Macquarie's gas supply equally amongst its counterparties – which included NextEra - with each counterparty ranked "50." (See NextEra SOMF ¶ 151; NextEra Mem. at 10.)

On February 15, 2021, following receipt of NextEra's Force Majeure notices, Macquarie changed NextEra's ranking from "50" to "99" or "999," the lowest ranking at the OGT Pool. (See NextEra SOMF ¶¶ 166-67; NextEra Mem. at 10-11.) From February 16 through February 19, 2021, NextEra remained Macquarie's lowest-ranked counterparty at the OGT Pool. (See NextEra SOMF ¶¶ 187-88, 203, 212, 218; NextEra Mem. at 14.) As a result of NextEra's low ranking and Macquarie's limited gas supply, Macquarie did not deliver any gas to NextEra at the OGT Pool on Gas Days 15, 16, 17, and 19 and made only a partial delivery on Gas Day 18. (See NextEra SOMF ¶¶ 197, 205, 208, 212, 218; Macquarie Mem. at 9; NextEra Mem. at 14.)

Macquarie did, however, deliver gas to its other
counterparties at the OGT Pool, who were all ranked higher
than NextEra, during the same period. (See NextEra SOMF ¶
234; NextEra Mem. at 14.)

In light of the undisputed facts outlined above, NextEra
insists that Macquarie's conduct was retaliatory (and thus
unreasonable) for two reasons. First, Macquarie downranked
NextEra at the OGT Pool starting on February 15, 2021, because
NextEra had partially cut its deliveries to Macquarie at the
EGT Pool the day prior, not because Macquarie believed that
NextEra could not receive gas at the OGT Pool, as Macquarie
now claims. (See NextEra Mem. at 1-2, 16, 20-21, 23.) Second,
the parties' experts agree that retaliation is unreasonable
conduct per industry standards. (See id. at 17; "NextEra
Reply," Dkt. No. 159 at 3-4.) Upon review of the evidence,
the Court finds that there are genuine disputes of material
fact regarding Macquarie's motivations in downranking NextEra
at the OGT Pool and whether Macquarie's decision to downrank
NextEra at the OGT Pool was reasonable under industry
standards.

    i.   Whether NextEra Could Receive Gas at the OGT Pool

First, whether Macquarie believed that NextEra could not
receive gas at the OGT Pool turns on credibility assessments
of both fact witnesses and expert opinions that are improper

23

at summary judgment. Regarding fact witnesses, several
Macquarie employees testified at deposition that Macquarie's
decision to prioritize other customers over NextEra at the
OGT pool was two-fold: (1) NextEra had issued Force Majeure
notices indicating that it may not be able to receive gas at
the OGT Pool, whereas no other counterparties indicated that
they would have trouble receiving gas, and (2) NextEra had
already deprioritized deliveries to Macquarie at other
locations, including the EGT Pool. (See Macquarie SOMF ¶¶ 53-
56.) In response, NextEra argues that the Macquarie employees
are not credible because Macquarie's belief that NextEra
could not receive gas at the OGT Pool is a "made-for-
litigation justification" that is "utterly devoid of
credibility and has no basis in the factual record." (See
NextEra Mem. at 1-2, 16, 20-21.)

NextEra's position is unpersuasive. Generally, district
courts should not assess the credibility of witnesses on a
motion for summary judgment. See Jeffreys, 426 F.3d at 551.
Although summary judgment may be appropriate in rare
circumstances where there is "nothing in the record to support
plaintiff's allegations other than plaintiff's own
contradictory and incomplete testimony," id. at 555
(discussing sham evidence), district courts should otherwise
not "engage in searching, skeptical analyses of parties'

testimony in opposition to summary judgment." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011).

Here, there is no basis to disregard the Macquarie employees' testimony as sham evidence, as the testimony is not internally contradictory and is consistent with NextEra's Force Majeure letters, which stated that NextEra may not have been able to receive gas at the OGT Pool during the Storm. (See NextEra Feb. 14 FM Notice (OGT); NextEra Feb. 16 FM Notice.) See Santiago v. Thong Sook Corp., No. 19 Civ. 5747, 2021 WL 3423623, at *4 (S.D.N.Y. Aug. 5, 2021).

As discussed further below, there is conflicting evidence in the record regarding NextEra's ability to receive gas at the OGT Pool and whether Macquarie should have taken NextEra's representations in its Force Majeure letters at face value. Thus, whether Macquarie's employees reasonably believed that NextEra may not have been able to receive gas at the OGT Pool is a credibility determination that cannot be made at this stage of the litigation.[11] Further, issues "which

---

[11] NextEra also argues that Macquarie engaged in discriminatory conduct by downranking NextEra, but not other counterparties who issued Force Majeure notices at the OGT Pool. (See NextEra Mem. at 18-19; NextEra Reply at 5-6.) NextEra's position is again dependent on the credibility of Macquarie's employees and the proper weight accorded to NextEra's Force Majeure letters, particularly in light of the fact that none of Macquarie's other counterparties issued a Force Majeure notice indicating that they would potentially be unable to receive gas. (See Macquarie SOMF ¶ 30.)

fundamentally implicate judgments about personal good faith, belief, motive and intent, generally entail fact-intensive inquiries more appropriately resolved at a trial on merits than by summary disposition." Mickle v. Christie's, Inc., 207 F. Supp. 2d 237, 250 (S.D.N.Y. 2002). Accordingly, whether the dealings between Macquarie and NextEra "were in good faith calls for a legal conclusion that . . . can be reached only after the fact-finder has considered all the evidence in light of credibility assessments that are not appropriate on a motion for summary judgment." Adelphia Recovery Tr. v. Bank of Am., N.A., No. 05 Civ. 9050, 2010 WL 3452374, at *6 (S.D.N.Y. Sept. 1, 2010); see also Kosher Ski Tours Inc., 2023 WL 8720273, at *5 (denying summary judgment where defendant's internal communications created an issue of material fact of whether defendant's failure to perform was due to the force majeure or discriminatory animus towards plaintiff's clientele).

NextEra's remaining arguments only highlight issues of fact and credibility here, which are largely distilled in the parties' expert reports.[12] As a general matter, "[s]ummary

---

[12] Although the parties do not challenge the admissibility of the expert testimony in this case, the "Court has the authority to assess the admissibility of each parties' expert testimony *sua sponte*, and without a formal motion or briefing on the issue." Pronti v. Hanover Ins. Co., 645 F. Supp. 3d 146, 152 (W.D.N.Y. 2022); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592–93 (1993), the district court functions as the

judgment is not favored in cases involving materially conflicting expert reports." Cohalan v. Genie Indus., Inc., No. 10 Civ. 2415, 2013 WL 829150, at *6 (S.D.N.Y. Mar. 1, 2013) (citation omitted); see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14 MDL 2542, 2025 WL 354671, at *4 n.3 (S.D.N.Y. Jan. 30, 2025) ("Once experts are qualified, then trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts in a context like summary judgment." (citation omitted)).

---

gatekeeper for expert testimony."). Under Federal Rule of Evidence 702 ("Rule 702"), a district court must assess three issues: "(1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." Washington v. Kellwood Co., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). If the expert testimony meets these minimum admissibility requirements, the testimony must be considered in the light most favorable to the non-moving party on summary judgment. See Amorgianos v. Amtrak, 303 F.3d 256, 267-68 (2d Cir. 2002).

The Court has carefully reviewed the expert reports and deposition testimony of Macquarie's experts James Buccigross ("Buccigross"), Kent Bayazitoglu ("Bayazitoglu"), and Jane Kidd ("Kidd") as well as NextEra's expert Bob Broxson ("Broxson") and concludes that the experts are qualified, apply reliable principles and methods, rely on sufficient facts and data, and will assist the trier of fact. See Fed. R. Evid. 702; see also Yang v. United States, 745 F. Supp. 3d 60, 67 (S.D.N.Y. 2024) ("Where a bench trial is in prospect, resolving Daubert questions at a pretrial stage is generally less efficient than simply hearing the evidence; if the moving party's objections are well-taken, the testimony will be disregarded in any event." (citation and alterations omitted)). (See Dkt. No. 115 ¶ 1 (parties' case management plan requesting a bench trial).) Although the parties challenge many of the experts' conclusions, which are discussed further below, those disputes go to the weight of the evidence rather than its admissibility. See Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 310, 329 (S.D.N.Y. 2022).

Relying on Broxson's expert report, NextEra contends that Macquarie should have known that NextEra could receive gas at the OGT Pool – despite NextEra's Force Majeure letters - because Macquarie knew that other counterparties were receiving gas at the OGT Pool. (See NextEra Mem. at 13, 20-21; "Broxson Rebuttal Rep. Excerpts," Dkt. No. 121-161 ¶ 4.4.) Macquarie's expert Buccigross disagreed with NextEra's position, testifying that NextEra may have been unable to receive gas at the OGT Pool for a multitude of reasons, such as issues with transportation capacity and limitations with other contracts, even though counterparties could physically receive gas at the OGT Pool. (See "Buccigross Dep. Excerpts," Dkt. No. 132-24 at 320:8-324:3.) "Because the credibility of the parties' experts is in issue here, summary judgment is inappropriate." Scanner Techs. Corp. v. Icos Vision Sys. Corp., N.V., 253 F. Supp. 2d 624, 636 (S.D.N.Y. 2003).

NextEra also argues that following receipt of NextEra's Force Majeure notices, Macquarie was obligated to determine whether NextEra actually had the capacity to receive gas at the OGT Pool because (1) NextEra indicated that it could receive gas at the OGT Pool through its scheduler, Kevin Brown ("Brown"), and (2) industry practice requires counterparties to coordinate with one another to avoid cuts made by the

pipeline due to mismatched nominations, which Macquarie failed to do. (<u>See</u> NextEra Mem. at 21; Broxson Rebuttal Rep. Excerpts ¶¶ 4.1-4.9.) Macquarie's experts Buccigross and Bayazitoglu disagreed with both of NextEra's propositions based on their own understandings of industry practice and their review of Brown's testimony.[13] (<u>See</u> "Buccigross Rep.," Dkt. No. 146-61 ¶¶ 74-81; "Bayazitoglu Rep. Excerpts," Dkt. No. 121-14 ¶¶ 79-80.) Whether industry practice required Macquarie to inquire about NextEra's actual ability to receive gas at the OGT Pool following the Force Majeure letters is disputed by the experts and thus cannot be resolved on summary judgment. <u>See</u> <u>Defaria v. Coleman</u>, No. 22 Civ. 1859, 2025 WL 903765, at *6 (S.D.N.Y. Mar. 24, 2025).

ii. <u>Whether Macquarie's Considerations for Downranking NextEra Were Retaliatory</u>

Second, NextEra argues that summary judgment is appropriate because the parties' experts agree that (1) retaliation is improper per industry standards, and (2) a

---

[13] Of course, the Court is not bound by an expert's interpretation of a fact witness's deposition testimony. <u>See</u> <u>U.S. Info. Sys., Inc. v. International Bhd. of Elec. Workers</u>, 313 F. Supp. 2d 213, 236-37 (S.D.N.Y. 2004). Upon review of Brown's deposition testimony and other evidence in the record, the Court concludes that it is unclear whether Brown communicated that NextEra was able to receive gas at the OGT Pool. (<u>See</u> "Brown Dep. Excerpts," Dkt. No. 138-46 at 65:23-66:12 (acknowledging that pipeline constraints could render NextEra unable to receive gas and that there were pipeline constraints at the OGT Pool during the Storm); Dkt. No. 132-19 (Amy Fullerton "Fullerton" Dep. Excerpts) at 167:16-168:7 (testifying that it was unclear whether Brown's contemporaneous messages during the Storm meant that NextEra could receive gas at the OGT Pool).)

retaliatory downranking on one pipeline due to conduct on
another pipeline is not justified. (See NextEra Mem. at 17;
NextEra Reply at 3.) The Court disagrees with NextEra's
characterization of the expert reports and testimony.
Although the parties' experts agree that retaliation is
generally improper, the experts disagree on whether
Macquarie's conduct was retaliatory (and thus unreasonable).

Macquarie's experts Buccigross and Bayazitoglu both
concluded that Macquarie's decision to downrank NextEra at
the OGT Pool was reasonable in light of NextEra's
underperformance at the EGT Pool. Buccigross stated in his
expert report that "[t]here is . . . no industry custom
prohibiting – when making allocation decisions – the
consideration of activities between the same counterparties
at another location or a counterparty's representations with
respect to its ability to receive gas." (Buccigross Rep.
¶ 68.) Buccigross concluded that in considering NextEra's
performance at the EGT Pool, there was "nothing inconsistent
about [Macquarie's] allocation decisions [at the OGT Pool]
with respect to industry custom and practice" and thus
Macquarie's "actions were reasonable in light of these
standards." (Id. ¶ 84.)

Similarly, Bayazitoglu stated in his expert report that
"performance of a counterparty is an acceptable consideration

when making allocation decisions" and that Macquarie's allocations at the OGT Pool were appropriate and consistent with industry customs. (Bayazitoglu Rep. Excerpts ¶¶ 73, 83.) At deposition, Bayazitoglu testified that there is "no industry standard on how counterparties are to be ranked" and that it was reasonable for Macquarie to consider NextEra's performance at the EGT Pool in ranking NextEra at the OGT pool because "these pipelines were covering the same geographic areas and they were both impacted by the same storm." ("Bayazitoglu Dep. Excerpts," Dkt. No. 132-30 at 258:17-260:24.)

NextEra's expert Broxson, however, concluded that Macquarie's conduct at the OGT Pool was unreasonable. (See "Broxson Rep.," Dkt. No. 146-59 ¶ 7.13.) In his expert report, Broxson stated that "[t]he downranking of a particular counterparty in response to that counterparty's perceived conduct on a different pipeline is not consistent with industry practice, particularly without transparent, cooperative communication." (Id.) Broxson concluded that Macquarie's downranking of NextEra was inconsistent with industry practice because Macquarie failed to notify NextEra that its ranking had been changed at the OGT Pool and misled NextEra about the justification, as Macquarie informed NextEra that its under-deliveries at the OGT Pool were due to

low temperatures and cuts to its upstream supply, even though
the under-deliveries were largely in response to NextEra's
underperformance at the EGT Pool. (See id. ¶¶ 7.10, 7.13;
Broxson Rebuttal Rep. Excerpts ¶ 3.7.)

Accordingly, the conflicting expert opinions on the
reasonableness of Macquarie's conduct – which considered
NextEra's performance at the EGT Pool – preclude summary
judgment. See Unit Petroleum Co. v. Koch Energy Servs., LLC,
No. 21 Civ. 1260, 2023 WL 4828375, at *3 (S.D. Tex. July 27,
2023) (denying summary judgment where the experts disagreed
on the reasonableness of the parties' allocations of natural
gas during Winter Storm Uri).

\*\*\*

In sum, whether Macquarie's conduct at the OGT Pool was
reasonable turns on industry standards regarding the
allocation of limited gas supply during a force majeure – a
question of fact to which the parties' experts will
testify – and whether Macquarie met or deviated from those
standards, which partially turns on the credibility of
Macquarie's employees, another genuine dispute of fact. See
Van Cortlandt v. Westchester Cnty., No. 07 Civ. 1783, 2009 WL
10740045, at *17 (S.D.N.Y. Sept. 18, 2009); see also Medical
Soc'y of N.Y. v. UnitedHealth Grp. Inc., No. 16 Civ. 5265,
2020 WL 1489800, at *6 (S.D.N.Y. Mar. 26, 2020) (denying

summary judgment where the parties' experts disputed the relevant industry standard to evaluate health benefit claims and whether defendants reasonably rejected plaintiffs' benefits claims). Given the genuine disputes of material fact identified above, NextEra cannot prevail on its retaliation theory on summary judgment.

   b.   *Profiteering Theory*

NextEra also argues that Macquarie engaged in economic opportunism, known as profiteering, because Macquarie prioritized high-priced, short-term sales over its long-term contracted allocations to NextEra during the Storm. (See NextEra Mem. at 19-20.) Profiteering occurs when a seller declares a force majeure and (disingenuously) informs lower priced buyers that their gas cannot be supplied due to the force majeure. In turn, the seller allocates the gas to a buyer who is willing to pay a much higher contract price. (See Buccigross Rep. ¶ 97.) It is widely accepted that profiteering is improper during a force majeure. (See NextEra Mem. at 20; NextEra SOMF ¶ 181.)

To refute NextEra's profiteering allegations, Macquarie argues that the transactions at issue were mostly executed before Macquarie downranked NextEra on Gas Day 15 and were long-term sales to existing customers. (See "Macquarie Opp'n," Dkt. No. 136 at 16; see also NextEra SOMF ¶¶ 142,

145, 146, 155.) In response, NextEra states that the Court need not consider Macquarie's arguments regarding profiteering because profiteering is not a necessary element of NextEra's motion for summary judgment. (See NextEra Reply at 6 n.16.) See also Anderson, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary" are not material and thus "will not be counted" in the summary judgment analysis). NextEra does not further address its profiteering theory in its Reply.

Accordingly, the Court concludes that NextEra is no longer pursuing its profiteering theory concerning Macquarie's alleged prioritization of short-term, high-priced sales to counterparties over sales to NextEra. See Jackson v. Federal Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."); see also HF Sinclair Ref. & Mktg., LLC v. NextEra Energy Mktg., LLC, No. 23 Civ. 1798, 2025 WL 1150690, at *5 (N.D. Tex. Apr. 17, 2025) (finding that NextEra abandoned various defenses by merely stating that a response to the counterparty's arguments would be a pointless exercise).

2.    <u>NextEra's Performance</u>

The parties do not dispute that NextEra underdelivered to Macquarie at the OGT and EGT Pools during the Storm, but NextEra claims that its underperformance is excused by the damage it suffered from the Force Majeure brought about by the Storm. (<u>See</u> NextEra Mem. at 23-27.) Specifically, NextEra maintains that its allocations of natural gas were fair and reasonable because NextEra prioritized counterparties that were serving human needs. (<u>See</u> <u>id.</u>) According to NextEra, Macquarie was not supplying gas to counterparties serving human needs during the Storm, and thus NextEra was justified in downranking Macquarie at the EGT and OGT Pools. (<u>See</u> <u>id.</u> at 25.) NextEra argues that its allocations based on human needs were justified on three grounds: (1) governmental orders applying to Oklahoma, (2) pipeline directives by EGT for the EGT Pool, and (3) pipeline directives by OGT for the OGT Pool. (<u>See</u> <u>id.</u> at 9-10.) The Court addresses each of NextEra's theories in turn.

*1.    Governmental Orders*

The Agreement defines a Force Majeure to include "governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction." (Gas Annex, Clause

35

(h)(ii)(E).) New York courts have recognized that governmental orders may constitute a force majeure. See <u>JN Contemp. Art LLC</u>, 29 F.4th at 123-24 (contract to hold live auction was properly terminated pursuant to force majeure clause because "the COVID-19 pandemic and the orders issued by New York's governor that restricted how nonessential businesses could conduct their affairs during the pandemic[] constituted 'circumstances beyond our or your reasonable control'"); <u>see also</u> <u>Nelkin v. Wedding Barn at Lakota's Farm, LLC</u>, 152 N.Y.S.3d 216, 220, 222-23 (N.Y. Civ. Ct. 2020) (cancellation of wedding-venue contract was excused under force majeure provision, which included "government regulations" and "disasters," where state government regulations required the cancellation of large gatherings and events during the COVID-19 pandemic).

NextEra has identified four governmental orders relevant to Oklahoma. On February 12, 2021, Governor Stitt issued Executive Order 2021-06, which declared a "disaster emergency caused by severe winter weather in all 77 Oklahoma counties that threatens the public's peace, health, and safety," and recognized that the severe weather was expected to cause damage to utilities, including electric, gas, and water systems in Oklahoma. (NextEra SOMF ¶ 94; Exec. Order 2021-06.)

On February 15, 2021, Southwest Power Pool ("SPP"), a regional transmission organization mandated by the Federal Energy Regulatory Commission whose territory includes Oklahoma, issued an emergency alert (the "SPP Emergency Alert") that extreme cold weather had created energy deficiencies and directed its member companies to issue public conservation appeals. (See NextEra SOMF ¶ 96.[14])

On February 16, 2021, the Oklahoma Corporation Committee ("OCC"), a state agency, issued Emergency Order No. 716952 (the "OCC Emergency Order"), which directed "natural gas and electric utilities" to "prioritize the delivery of natural gas" to the extent "necessary for life, health, and public safety." (NextEra SOMF ¶¶ 97, 199; see also "OCC Emergency Order," Dkt. No. 128-67 at 3.)

On February 18, 2021, President Biden issued the Federal Declaration, which recognized a state of emergency in Oklahoma and ordered federal assistance to support disaster relief efforts in Oklahoma. (See NextEra SOMF ¶ 98; see also Fed. Decl.)

The Court finds that the Executive Order 2021-06, the SPP Emergency Alert, and the Federal Declaration did not

---

[14] (See SPP Issues New Emergency Alert Due to Extreme Cold, SOUTHWEST POWER POOL (Feb. 15, 2021) https://www.spp.org/news-list/spp-issues-new-energy-emergency-alert-due-to-extreme-cold) [hereinafter, "SPP Emergency Alert"].)

prevent NextEra's performance, as those governmental orders did not issue directives to utilities or gas companies that implicated NextEra's performance under the Agreement. See Harriscom Svenska, AB v. Harris Corp., 3 F.3d 576, 580 (2d Cir. 1993); see also Morgan St. Partners, LLC v. Chicago Climbing Gym Co., LLC, No. 20 Civ. 4468, 2022 WL 602893, at *4 (N.D. Ill. Mar. 1, 2022) ("[F]or a force majeure clause to apply by government order or regulation, the order must clearly direct or prohibit an act which proximately causes non-performance or breach of a contract." (citation omitted)). The Executive Order 2021-06 declared a state of emergency in Oklahoma and made resources available to state departments and agencies to carry out disaster relief. (See Exec. Order 2021-06.) The Federal Declaration authorized the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to coordinate disaster relief efforts with local and state authorities in Oklahoma. (See Fed. Decl.) NextEra cannot plausibly argue that the Executive Order 2021-06 and the Federal Declaration – which provided resources to state and federal agencies in support of disaster relief – meant that NextEra was prevented from delivering gas to Macquarie. Further, there is no support for NextEra's suggestion that the SPP Emergency Alert directed NextEra to supply gas to counterparties servicing human needs, as the

SPP Emergency Alert merely instructed member companies to make public appeals to conserve energy. (<u>See</u> SPP Emergency Alert; NextEra SOMF ¶ 96; NextEra Mem. at 25.)

At first glance, NextEra's most plausible argument lies with the OCC Emergency Order issued on February 16, 2021, which required the prioritization of natural gas deliveries to the extent "necessary for life, health, and public safety." (NextEra SOMF ¶ 97.) <u>See</u> <u>JN Contemp. Art LLC</u>, 29 F.4th at 123–24; <u>see</u> <u>also</u> <u>cf.</u> <u>Northern Nat. Gas Co. v. Approximately 9117 Acres In Pratt, Kingman, & Reno Ctys., Kan.</u>, 114 F. Supp. 3d 1144, 1155 (D. Kan. 2015) ("Governmental actions, including orders to halt oil and gas production, have been held to constitute force majeure events."); <u>East Air Lines, Inc. v. McDonnell Douglas Corp.</u>, 532 F.2d 957, 994 (5th Cir. 1976) ("[F]undamentally coercive acts of Government, whatever their form, constitute an excuse for breach [of contract].").

However, the OCC Emergency Order was directed to "natural gas and electric utilities." (OCC Emergency Order at 3.) Indeed, the OCC has "general supervision over all public utilities, with power to . . . prescribe and promulgate rules, requirements and regulations." 17 Okla. Stat. Ann. § 152(A). In turn, "public utilities" are defined to include "every corporation, association, [or] company" that "may own, operate, or manage any plant or equipment, or any part

thereof, directly or indirectly, for public use, or may supply any commodity to be furnished to the public," including "for the conveyance of gas by pipeline" or "for the production, transmission, delivery, or furnishing of heat or light with gas." 17 Okla. Stat. Ann. § 151(A)(1). Although NextEra and Macquarie both supplied gas to counterparties serving human needs during the Storm, NextEra and Macquarie do not own or operate any infrastructure for the distribution of natural gas and do not directly supply natural gas to the public, suggesting that Macquarie and NextEra are not public utilities within the ambit of the OCC. Compare <u>Nowata Cnty. Gas Co. v. Henry Oil Co.</u>, 269 F. 742, 747 (8th Cir. 1920) (finding company that produced and shipped natural gas – but did not furnish gas directly to the general public - was not a public utility under Oklahoma law), <u>with</u> <u>Oklahoma Nat. Gas Co. v. Corporation Comm'n of Okla.</u>, 216 P. 917, 918 (Okla. 1923) (concluding that the Oklahoma Natural Gas Company ("ONG") was a public utility because ONG produced, purchased, transmitted, and distributed natural gas, noting that ONG owned the distribution systems and furnished gas directly to the public in various cities in Oklahoma); <u>but</u> <u>see</u> <u>In re Traders Compress Co.</u>, 381 F. Supp. 789, 797 (W.D. Okla. 1973) (finding propane distributor was a public utility under Oklahoma law because the distributer indirectly supplied

propane to the public and the propane would be used by the public for domestic purposes and to produce heat). Thus, it is unclear whether the OCC Emergency Order extended to NextEra and Macquarie as intermediaries supplying gas to counterparties directly serving human needs.[15]

And even assuming that the OCC Emergency Order extended to NextEra, the evidence shows that NextEra downranked Macquarie at the OGT and EGT Pools several hours before the OCC Emergency was issued. The parties do not dispute that the OCC Emergency Order was issued sometime in the evening on February 16, 2021. (See NextEra SOMF ¶ 199.) But at both the OGT and EGT Pools, NextEra downranked Macquarie the morning of February 16, 2021. (See NextEra Mem. at 10; "Macquarie SAMF," Dkt. No. 137 at 108-124, ¶ 20.) "It is well-established that in order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract." Kosher Ski Tours Inc., 2023 WL 8720273, at *5. Given that

---

[15] Macquarie maintains that the OCC Emergency Order is immaterial because OCC's jurisdiction does not extend to Macquarie and NextEra. In support of this position, Macquarie relies on a memorandum from the Texas Railroad Commission Office of General Counsel, which adopted certain amendments to the Texas Administrative Code, and the Texas Supreme Court's interpretation of a Texas statute, which found that the Texas Railroad Commission did not have jurisdiction or authority over natural gas transportation contracts between non-utilities. (See "Macquarie Objs. to NextEra SOMF," Dkt. No. 137 at 1-108, ¶¶ 95, 97.) Macquarie makes no effort to explain how the Texas Administrative Code or the Texas statute at issue are synonymous with Oklahoma statutes or relevant to evaluating OCC's jurisdiction. Given the lack of support for Macquarie's position, the Court will not wade further into the issue of OCC's jurisdiction unnecessarily.

NextEra downranked Macquarie at the OGT and EGT Pools before the OCC Emergency Order was issued, NextEra has failed to show that the OCC Emergency Order was the proximate cause of its underperformance.

Accordingly, the Court finds that the Executive Order 2021-06, the SPP Emergency Alert, and the Federal Declaration did not issue directives that implicated NextEra's obligations under the Agreement and thus are not governmental orders that constitute a Force Majeure. Further, even if the directives in the OCC Emergency Order were binding on NextEra, the OCC Emergency Order did not cause NextEra to downrank Macquarie and thus cannot excuse NextEra's performance at the EGT and OGT Pools.

   2.  *NextEra's Allocations at the EGT Pool*

NextEra argues that various EGT pipeline directives required NextEra to prioritize counterparties that were serving human needs. (See NextEra Mem. at 6-10, 25-27.) Pursuant to the EGT Tariff, EGT – as the pipeline company – could issue (1) operational alerts, (2) standard operational flow orders ("Standard OFOs"), and (3) emergency operational flow orders ("Emergency OFOs"). (See "EGT Tariff," Dkt. No. 141-58 § 20.3(a)(iii), (c).) An operational alert consists of "[a] list of remedial measures which can be voluntarily undertaken by Shippers or any other entities affecting the

system to correct the situation." (Id. at § 20.3(a)(iii).) In turn, Standard and Emergency "Operational Flow Orders shall describe . . . the operational problem to be addressed, the action required to be taken, the parties affected, the time by which Shippers must take the required action." (Id. at § 20.3(c).) A shipper who failed to comply with a Standard or Emergency OFO would be subject to steep penalties, which were further specified by the EGT Tariff. (See id.) However, no penalty would be assessed if a shipper's noncompliance was directly caused by force majeure. (See id; NextEra SOMF ¶ 104.)

EGT issued several notices in response to the Storm. On February 15, 2021, at 8:52 AM CT, EGT issued Critical Notice 4413, which was an operational alert. (See NextEra SOMF ¶ 158; "EGT Critical Notice 4413," Dkt. No. 128-70.) Critical Notice 4413 outlined the various steps that EGT would take to ensure that shippers with human needs customers would have access to gas supply while maintaining the integrity of the pipeline system: (1) EGT would solicit voluntary reductions in gas usage by shippers, (2) EGT would curtail deliveries to human needs customers last, (3) if conditions warranted proactive steps to ensure sufficient gas supply to human needs customers, EGT would issue standard and/or emergency operational flow orders directing shippers that were not

43

serving human needs to reduce gas consumption, with steep penalties for non-compliance. (See EGT Critical Notice 4413 at 2-3.)

Following the issuance of Critical Notice 4413, NextEra corresponded with Macquarie to determine whether Macquarie was supplying gas to human needs counterparties at the EGT Pool. On February 15, 2021, at 11:22 AM CT, NextEra employee Daniel O'Leary ("O'Leary") emailed Macquarie scheduler Richard Jansen ("Jansen"), requesting that Macquarie certify that it was serving human needs counterparties at the EGT Pool. (See NextEra SOMF ¶ 160.) However, Jansen never responded to O'Leary's email. (See id. ¶ 161.) At 1:25 PM CT, Robert Irwin ("Irwin") from NextEra separately messaged Macquarie's managing director David Virgilio ("Virgilio") to determine whether Macquarie was selling gas to customers who were serving human needs at the EGT Pool. (See Macquarie SAMF ¶ 25; see also Dkt. No. 121-155.) Virgilio confirmed that all gas at the EGT Pool would be going to Macquarie's counterparty serving human needs. (See Macquarie SAMF ¶ 25.) Irwin never responded to Virgilio's message. (See id. ¶ 26.)

On February 16, 2021, at 8:27 AM CT, EGT issued Critical Notice 4414 – an Emergency OFO – which notified shippers of EGT's protocol regarding the human needs affidavits. (See NextEra SOMF ¶ 105; "EGT Critical Notice 4414," Dkt. No. 128-

71.) Critical Notice 4414 stated that shippers who had not provided a human needs affidavit, as defined by the EGT Tariff, had two hours to reduce their deliveries to zero. (See NextEra SOMF ¶ 105.) Following this two-hour period, EGT would take action to ensure that deliveries not designated to serve human needs were reduced to zero. (See id.) Within minutes of Critical Notice 4414 being posted, NextEra downranked Macquarie to "999" for Gas Day 16. (See Macquarie SAMF ¶ 20; NextEra SOMF ¶ 185.)

Approximately two hours later at 10:22 AM CT, EGT issued Critical Notice 4415 – another Emergency OFO – stating that all deliveries to shippers who had not submitted a human needs affidavit would be reduced to zero. (See NextEra SOMF ¶ 106; "EGT Critical Notice 4415," Dkt. No. 128-72.) Critical Notice 4415 also reminded shippers that non-compliance would result in penalties pursuant to the EGT Tariff. (See EGT Critical Notice 4415.) At 3:06 PM CT, EGT issued Critical Notice 4416 – an operational alert - which stated that "shippers with Human Needs should be ranked with the highest priority" and included a list of shippers that had submitted human needs affidavits. (See NextEra SOMF ¶ 108; "EGT Critical Notice 4416," Dkt. No. 128-73.) Neither Macquarie nor NextEra were listed as human needs shippers, (see EGT Critical Notice

4416), and NextEra's ranking of Macquarie ("999") at the EGT Pool remained unchanged. (See NextEra SOMF ¶ 185.)

On February 17 and 18, 2021, EGT issued several updated lists of shippers who had submitted human needs affidavits. (See id. ¶¶ 111-21.) Macquarie and NextEra were not included on those lists, as they did not submit human needs affidavits. (See id.; see also Macquarie Objs. to NextEra SOMF ¶¶ 111-21.) On Gas Days 17 and 18, NextEra ranked Shell Energy North America (US), L.P. ("Shell"), Black Hills Energy Inc. ("Black Hills"), and Southwestern Electric Power Company ("SWEPCO") as "1" on the basis that each of those counterparties were listed as human needs shippers. (See NextEra SOMF ¶¶ 110, 201, 209.) NextEra assigned a ranking of "999" to counterparties not listed as human needs shippers (including Macquarie) and did not deliver any gas to those counterparties on Gas Days 17 and 18. (See id. ¶¶ 201-02, 210-11.) At 2:21 PM CT on February 18, 2021, EGT lifted the Critical Notices issued on February 16, 2021. (See id. ¶ 122.)

NextEra argues that its low priority ranking of Macquarie from February 16 to 18, 2021, was justified because (1) Macquarie failed to notify NextEra that it was serving human needs counterparties, (2) the EGT Critical Notices required NextEra to prioritize shippers who were serving human needs, and (3) it is common practice to prioritize human

46

needs in light of pipeline directives. (See NextEra Mem. at 9-10, 25-26.)

First, NextEra's contention that Macquarie did not confirm with NextEra that it was serving human needs counterparties at the EGT Pool, (see id. at 25), is belied by the record. Macquarie points to evidence showing that on February 13, 2021, Virgilio from Macquarie informed Chris Roettger ("Roettger") from NextEra that Macquarie was supplying gas to utilities at the EGT Pool, suggesting that Macquarie was supplying gas to human needs counterparties. (See Macquarie SAMF ¶ 24.) Further, on February 15, 2021, Virgilio confirmed with Irwin from NextEra that Macquarie's gas supply was going to a counterparty serving human needs. (See id. ¶ 25; see also Dkt. No. 121-155.)

In response, NextEra maintains that the correspondence between NextEra and Macquarie on February 13 and 15, 2021, is immaterial because those exchanges preceded the EGT Critical Notices issued on February 16, which required NextEra to prioritize counterparties who had submitted a human needs affidavit. (See "NextEra Objs. to Macquarie SAMF," Dkt. No. 158 ¶¶ 21-23.) Thus, NextEra appears to claim that it properly disregarded Macquarie's representation that it was serving human needs in light of the EGT Critical Notices based on Macquarie's failure to submit a human needs affidavit. (See

id.; but see "Broxson Dep. Excerpts," Dkt. No. 146-55 at
184:6-18 (testifying that NextEra prioritized gas deliveries
"to the companies that were known as human needs customers or
that had the affidavit on the EGT system").)

    Macquarie argues that it did not submit a human needs
affidavit because the affidavits were reserved for
counterparties *directly* serving human needs, not
intermediaries like Macquarie and NextEra who were supplying
gas to those counterparties. (See Macquarie Opp'n at 24.) The
EGT Tariff does little to support Macquarie's position. The
EGT Tariff allowed shippers to seek an exemption from Standard
or Emergency OFOs if the gas to be transported was "required
to forestall irreparable injury to life or property
(including environmental emergencies)" or "to protect human
needs requirements" by submitting an affidavit that specified
the amount of gas required to address those high priority
uses. (EGT Tariff § 10.10(c).) Based on this language, there
is no suggestion that the EGT Tariff prohibited shippers who
were indirectly serving human needs from submitting an
affidavit. In practice, EGT did not appear concerned about
whether a shipper was serving human needs directly or
indirectly. Amy Morris ("Morris"), EGT's corporate
representative, stated that EGT "accept[ed] shippers' human
needs affidavits at face value as the shipper [was] certifying

under oath that the level of service they ha[d] designated as human needs qualifie[d] for such treatment." ("Morris Decl.," Dkt. No. 132-2 ¶ 14.) Thus, the Court is not persuaded by Macquarie's position that the EGT Tariff precluded Macquarie and NextEra from submitting human needs affidavits.

Circumstantial evidence, however, lends support to Macquarie's theory that shippers who were not directly serving human needs, but were supplying gas to counterparties who were, did not submit human needs affidavits as a matter of practice. First, both Macquarie and NextEra did not submit human needs affidavits, even though both were supplying gas to human needs counterparties downstream. (See NextEra SOMF ¶¶ 111-21; Macquarie SAMF ¶¶ 18, 24-25.) Second, even though neither party submitted a human needs affidavit, both parties continued to receive and ship gas to human needs counterparties. (See NextEra SOMF ¶¶ 202, 209-11; Macquarie Objs. to NextEra SOMF ¶¶ 202, 209-11; Macquarie SAMF ¶ 18.) Critical Notice 4414, the first Emergency OFO issued on February 16, 2021, instructed shippers who had not submitted a human needs affidavit to reduce their deliveries to zero within two hours. (See EGT Critical Notice 4414.) As a shipper who had not submitted a human needs affidavit, NextEra was required to reduce deliveries from the EGT Pool to zero, meaning that NextEra was not supposed to receive any gas at

the OGT Pool once the two-hour window expired. (See id.; see also EGT Critical Notice 4415.) But NextEra kept receiving gas at the EGT Pool, and in turn, supplied that gas to parties who had submitted human needs affidavits. (See NextEra SOMF ¶¶ 111-21.) Thus, NextEra appeared to believe that it could continue receiving gas – despite not submitting a human needs affidavit – because NextEra was supplying gas to downstream parties that had certified, through an affidavit, that they were serving human needs. The same logic applies to Macquarie: Even though Macquarie did not submit an affidavit, Macquarie believed that it was proper for it to continue receiving gas at the EGT Pool in order to supply that gas to its downstream party who had certified, through an affidavit, that it was serving human needs. (See Macquarie SAMF ¶ 18; Macquarie Objs. to NextEra SOMF ¶¶ 202, 209-11.)

There is also evidence in the record suggesting that parties considered whether their counterparties at the EGT Pool were supplying gas to human needs servicers further downstream. For example, Macquarie's upstream counterparty, Koch Energy Services ("Koch"), contacted Macquarie on February 15, 2021, to inquire whether Macquarie was supplying gas for human needs. (See Macquarie SAMF ¶ 25.) Macquarie confirmed that it was supplying gas to a utility company downstream that was serving human needs. (See id.) In

50

response, Koch stated that due to the Force Majeure, Koch
would be allocating its gas supply amongst human needs
counterparties and that Macquarie would receive allocations
based on Macquarie's human needs counterparty downstream.
(See id.) After the EGT Critical Notices were issued on
February 16, 2021, Macquarie continued to receive gas from
Koch, albeit in reduced volumes, during the Storm even though
Macquarie never submitted a human needs affidavit. (See
Macquarie SAMF ¶¶ 57-59; see also "Kidd Rep.," Dkt. No. 132-
39 ¶ 50.) In light of those facts, the Court cannot determine
whether NextEra's decision to downrank Macquarie – on the
basis that Macquarie did not submit a human needs affidavit -
was reasonable given that NextEra knew that Macquarie was
supplying gas to a human needs counterparty downstream.

Lastly, NextEra argues that its allocations to Macquarie
were fair and reasonable because it is "common market
practice" to prioritize counterparties supporting human needs
in compliance with pipeline directives. (See NextEra Mem. at
24.) However, NextEra does not point to any case law or expert
opinion supporting the proposition that allocations based on
human needs are reasonable as a matter of law. (See Macquarie
SAMF ¶ 73.) See Whalen v. CSX Transp., Inc., No. 13 Civ 3784,
2017 WL 4075200, at *4 (S.D.N.Y. Sept. 13, 2017) (industry
standards should be considered with other facts and

circumstances to determine whether a party's conduct was reasonable). Further, NextEra's reliance on <u>Tejas Power v. Amerada Hess</u>, No. 98 Civ. 346, 1999 WL 605550 (Tex. App. Aug. 12, 1999) underscores that the reasonableness of a party's allocations based on human needs turns on factual findings made at trial. <u>Id.</u> at *2 (concluding that defendant's allocations of natural gas, which were made according to human needs, were reasonable based on the evidence presented at trial). Ultimately, whether NextEra's allocations to Macquarie - which were reduced in favor of counterparties serving human needs - were fair and reasonable constitute factual disputes that cannot properly be resolved on summary judgment motions but are to be determined at trial.

### 3. *NextEra's Allocations at the OGT Pool*

The parties do not dedicate much briefing to NextEra's delivery obligations to Macquarie at the OGT Pool. At the OGT Pool, the parties initially agreed for Macquarie to sell NextEra a total daily volume of 30,000 MMBtu from November 1, 2020, through March 31, 2021. (<u>See</u> NextEra SOMF ¶ 46.) In January 2021, the parties agreed for Macquarie to purchase 5,000 MMBtu from NextEra at the OGT Pool, known as a "buyback" or a "bookout," during the entire month of February 2021. (<u>See</u> <u>id.</u> ¶¶ 47-48.) As result of the buyback transaction, the parties frequently nominated a net quantity of 25,000 MMBtu

at the OGT Pool, instead of entering separate nominations for 30,0000 MMBtu (Macquarie's contracted volume to NextEra) and 5,000 MMBtu (NextEra's contracted volume to Macquarie). (See id. ¶ 48.) The parties booked out NextEra's delivery obligation of 5,000 MMBtu on Gas Days 14, 15, and 16. (See NextEra SOMF ¶¶ 154, 196; Dkt. No. 146-41 (Fullerton Dep. Excerpts) at 60:4-25.) On Gas Day 16, Brown from NextEra asked Fullerton from Macquarie to cancel the bookout starting on Gas Day 17, resulting in (1) a nomination of the full 30,000 MMBtu for Macquarie to deliver to NextEra and (2) a nomination of 5,000 MMBtu for NextEra to deliver to Macquarie. (See NextEra SOMF ¶ 191; see also "Buccigross Rebuttal Rep.," Dkt. No. 146-62 ¶¶ 45, 48.)

NextEra did not deliver any gas to Macquarie at the OGT Pool on Gas Days 17 and 18 because NextEra had prioritized counterparties with human needs. (See NextEra Mem. at 27; NextEra SOMF ¶ 208.) The parties' arguments concerning NextEra's human needs justification at the OGT Pool are largely unsupported. At the OGT Pool, NextEra prioritized human needs in light of the operational flow orders issued by OGT ("OGT OFOs") and the EGT Critical Notice 4414. (See NextEra Mem. at 9-10.) The OGT OFOs, which were issued on February 15 and 17, 2021, stated that in light of the worsening weather conditions, (1) OGT would make capacity

curtailments as necessary and (2) counterparties were directed to ensure that nominations matched flow quantities. (See NextEra SOMF ¶¶ 99-101; see also "Feb. 15 OGT OFOs," Dkt. Nos. 128-68, 128-69; "Feb. 17 OGT OFO," Dkt. No. 128-74.) None of the OGT OFOs mentioned human needs (unlike the EGT directives discussed above) and there is no indication that OGT separately instructed counterparties to prioritize human needs. Although NextEra maintains it considered EGT's directives in Critical Notice 4414, the EGT Critical Notice 4414 was applicable only to the EGT Pipeline and did not require NextEra to take any action at the OGT Pool.[16]

Macquarie's arguments rebutting NextEra's human needs justification fare no better. Macquarie suggests that NextEra's ranking of Macquarie below ONG and HollyFrontier Refining & Marketing LLC ("HFS") – which NextEra believed were serving some limited, quasi-human needs functions – was improper because Macquarie had confirmed with NextEra that it was supplying gas to human needs counterparties. (See Macquarie Objs. to NextEra SOMF ¶¶ 140, 207, 213; NextEra Mem. at 10.) But Macquarie informed NextEra it was serving a human needs counterparty at the EGT Pool, not the OGT Pool.

---

[16] NextEra's reliance on directives from EGT to justify its conduct at the OGT Pool also appears at odds with NextEra's theory that conduct on one pipeline cannot be considered on another pipeline.

(<u>See</u> Macquarie SAMF ¶¶ 23-25.) Nor has Macquarie separately identified which human needs counterparty it was serving at the OGT Pool to warrant a higher priority ranking.

On Gas Day 19, NextEra did not deliver any gas to Macquarie at the OGT Pool. (<u>See</u> NextEra SOMF ¶ 218.) According to NextEra, Macquarie was to blame for NextEra's failure to deliver gas at the OGT Pool because (1) Macquarie was NextEra's only supplier at the OGT Pool on Gas Day 19, and (2) Macquarie did not deliver any gas to NextEra at the OGT Pool on Gas Day 19. (<u>See</u> NextEra Mem. at 27.) In response, Macquarie points to evidence that a separate counterparty was also contracted to deliver gas to NextEra at the OGT Pool on Gas Day 19 but acknowledges that the counterparty did not deliver any of the contracted volumes. (<u>See</u> Macquarie Objs. to NextEra SOMF ¶ 220.) Given that NextEra cancelled the bookout and had another supplier at the OGT Pool, the Court is not persuaded that Macquarie is solely to blame for NextEra's failure to deliver 5,000 MMBtu to Macquarie on Gas Day 19.

To further complicate matters, the parties' experts seem to dispute whether NextEra was required to deliver any gas to Macquarie at the OGT Pool in light of the bookout cancellation on Gas Day 17. (<u>See</u> Buccigross Rebuttal Rep. ¶¶ 43, 45-48 (highlighting the disagreements between Buccigross and

Broxson regarding the implications of the bookout cancellation).)

Given the various disputes of material fact discussed above, whether NextEra's obligations at the OGT Pool were excused by the Agreement's Force Majeure provision will be determined at trial, not on a motion for summary judgment.

***

For the reasons explained above, there are genuine issues of material fact that preclude summary judgment in favor of NextEra. Accordingly, NextEra's motion for partial summary judgment is **DENIED**.

B.    MACQUARIE'S CROSS-MOTION FOR SUMMARY JUDGMENT

In its cross-motion for summary judgment, Macquarie argues that (1) Macquarie's performance was excused by the Agreement's Force Majeure clause, (2) NextEra's performance was not excused by the Force Majeure clause, and (3) NextEra has failed to prove damages and thus cannot establish an essential element of its breach of contract claim. (See generally Macquarie Mem.) As explained above, there are numerous genuine issues of material fact concerning each party's performance during the Storm that preclude summary judgment. Nor can those issues be resolved on Macquarie's cross-motion for summary judgment, regardless of the burden of proof. See Minerva Textiles, Ltd. v. ABC Superstores, Inc.,

No. 13 Civ. 8954, 2015 WL 14079003, at *5 (S.D.N.Y. Sept. 11, 2015); Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014). Accordingly, the Court will not reexamine whether each party has shown that its allocations were fair and reasonable and will address only Macquarie's damages arguments.

1.    NextEra's Damages

Macquarie argues that even if NextEra prevails on liability, the evidence forecloses NextEra's claimed damages. (See Macquarie Mem. at 20-24.) Under New York law, "[d]amages are an essential element of a breach of contract claim." Tenor Opportunity Master Fund, Ltd. v. Oxygen Biotherapeutics, Inc., No. 11 Civ. 6067, 2012 WL 2849384, at *5 (S.D.N.Y. Jul. 11, 2012) (citation omitted); Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016) ("Proof of damages is an essential element of a claim for breach of contract under New York law."). Although damages must be "reasonably certain," the certainty principle "refers to the fact of damage, not the amount." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007) (citation omitted). Thus, if a plaintiff can "demonstrate a genuine issue of fact as to the existence of actual damages resulting from the breach of contract, then summary judgment . . . is inappropriate even if the precise amount or

extent of the damages is still somewhat uncertain." V.S. Int'l, S.A. v. Boyden World Corp., No. 90 Civ. 4091, 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993); see also HostingXtreme Ventures, LLC v. Bespoke Grp., LLC, No. 14 Civ. 1471, 2017 WL 4012922, at *5 (N.D. Tex. Aug. 23, 2017) ("[Plaintiff] has the burden to provide some evidence of cover damages to show a genuine issue of material fact to preclude summary judgment on its claim.").

The Agreement provides for two types of damages, known as "cover" damages and "spot" damages, for an unexcused failure to receive or deliver gas. (See Gas Annex Addendum, Clause (b).) Cover damages are available if a buyer purchases more expensive gas on the market to replace the gas that the seller failed to deliver. (See id.) Spot damages are available if a buyer "used commercially reasonable efforts to replace the Gas" that the seller failed to deliver, but no replacement gas was available. (Id.) The Agreement also provides calculation methods for both types of damages. (See id.)

NextEra seeks damages for Gas Days 15 through 19, and more specifically, spot damages on Gas Days 15, 16, 18, and 19 and cover damages on Gas Days 17 and 18. (See Macquarie SOMF ¶ 58.) Macquarie concedes that it did not deliver any gas to NextEra at the OGT Pool on Gas Days 15, 16, 17, and 19 and made only a partial delivery on Gas Day 18. (See Macquarie

Mem. at 9.) Nonetheless, Macquarie maintains that NextEra is not entitled to damages for three reasons. First, Macquarie argues that NextEra cannot recover spot damages for Gas Days 15, 16, and 19 because there is no evidence that NextEra made efforts to purchase replacement gas for those Gas Days. (See id. at 21-23.) Second, Macquarie argues that NextEra cannot recover spot or cover damages for any Gas Days because NextEra "passed" Macquarie's Force Majeure to its downstream parties – meaning that NextEra proportionally cut its deliveries to downstream parties based on Macquarie's delivery deficit – showing that NextEra did not intend to purchase replacement gas. (See id. at 23-24.) Third, Macquarie insists that even if NextEra made efforts to purchase or actually purchased replacement gas, NextEra would have done so regardless of Macquarie's underdeliveries because NextEra had not secured enough gas for the month of February to meet its downstream obligations and thus would have needed to purchase gas on the open market anyway. Accordingly, Macquarie argues that NextEra cannot recoup costs it incurred buying gas to remedy NextEra's existing gas deficit, as the Agreement provides for damages only when a buyer seeks to replace the gas it did not receive from the seller. (See id.) The Court addresses Macquarie's arguments in turn.

a.   *Spot Damages*

Macquarie argues that NextEra cannot recover spot damages for Gas Days 15, 16, and 19 because there is no evidence in the record showing that NextEra attempted to purchase replacement gas for those Gas Days. (See Macquarie Mem. at 21-23.) In support of its position, Macquarie relies on the testimony of two NextEra employees, Irwin and Daniel Cairnes ("Cairnes").[17] (See id. at 21-22.) At deposition, Irwin testified that he could not remember whether he had made efforts to buy and replace gas that was cut by upstream counterparties during the Storm. (See Irwin Dep. Excerpts at 104:2-6.) Several weeks later, Cairnes testified that he had spoken to Irwin to prepare for his deposition as a Rule 30(b)(6) witness and that Irwin confirmed that he had made calls to several companies requesting gas for NextEra at the OGT Pool. (See Macquarie SOMF ¶¶ 93-94.) Cairnes also testified that NextEra "may have attempted" to buy gas for Gas Day 19 but noted that Irwin was responsible for purchasing gas at the OGT Pool for NextEra. (Cairnes Dep. Excerpts at 128:8-16, 151:6-11.) However, upon reviewing NextEra's transaction data, Cairnes concluded that NextEra ultimately

---

[17] Irwin was deposed on February 21, 2024. (See "Irwin Dep. Excerpts," Dkt. No. 121-164 at 1.) Cairnes was deposed on April 9, 2024, and was NextEra's designated corporate representative pursuant to Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)"). (See "Cairnes Dep. Excerpts," Dkt. No. 121-56 at 1.)

did not need to seek replacement on Gas Day 19. (See id. at 151:20-25.)

In support of its opposition, NextEra submitted a sworn declaration from Irwin (the "Irwin Declaration"). (See "Irwin Decl.," Dkt. No. 146-141.) In that Declaration, Irwin explained that at deposition, he was not provided any documents that would have refreshed his recollection of events that occurred several years prior and specifically, whether he had made efforts to purchase gas during the Storm. (See id. ¶ 3.) Following his deposition, Irwin reviewed numerous materials, including his contemporaneous correspondence via ICE chats and the trading data from NextEra's internal spreadsheets, which confirmed his efforts to secure replacement gas for February 12 through 18, 2021, at the OGT Pool. (See id. ¶¶ 4, 7, 9-12.) NextEra also submitted ICE chats and spreadsheets referenced in the Irwin Declaration. (See Dkt. Nos. 146-112, 146-144.)

Macquarie argues that the Irwin Declaration should not be considered because it contradicts Irwin's prior deposition testimony. (See "Macquarie Reply," Dkt. No. 152 at 9.) As a general matter, "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment," Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987), because a party cannot "show a

triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). Accordingly, a district court may disregard a subsequent affidavit that "inescapably and unequivocally" contradicts the witness's earlier testimony "without explanation." Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205-06 (2d Cir. 2014).

However, "[a] court should not disregard the [post-deposition] testimony because of an earlier account that was ambiguous, confusing, or simply incomplete," Kassman v. KPMG LLP, No. 11 Civ. 03743, 2014 WL 3298884, at *11 (S.D.N.Y. July 8, 2014) (citation omitted), "where the later sworn assertion addresses an issue that . . . was not thoroughly or clearly[] explored in the deposition," Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000), or where the subsequent sworn testimony "amplifies or explains, but does not merely contradict" the prior testimony. Rule, 85 F.3d at 1011; see also Federal Deposit Ins. Corp. v. Murex LLC, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) ("If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment.").

The Court finds that the Irwin Declaration does not definitively contradict Irwin's prior testimony and is largely consistent with other evidence in the record regarding NextEra's efforts to purchase replacement gas. Although a party generally "cannot create a triable issue of fact . . . by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember," this rule does not apply "where the deposition testimony at issue is contradicted by evidence other than the deponent's subsequent affidavit." Federal Deposit Ins. Corp., 500 F. Supp. 3d at 94-95 (citation omitted). Here, the Irwin Declaration relies on various spreadsheets and ICE chats that plausibly support Irwin's (albeit belated) conclusion that he made efforts to purchase replacement gas for Gas Days 15 through 18. (See Irwin Decl. ¶¶ 9-10, 12 (citing Dkt. Nos. 146-112, 146-144).) Further, Irwin attests that he called numerous counterparties, including BP Energy, Southwest Energy, ARM Energy, Koch, Tenaska, and Ovintiv, for replacement gas between February 12 and February 18, 2021, which mirrors Irwin's prior conversations with Cairnes, which Cairnes recounted during his deposition as NextEra's corporate representative. (See id. ¶¶ 7-8, 11 (citing Cairnes Dep. Excerpts at 155:13-21).) In light of this evidence, the Court will not disregard the

Irwin Declaration at the summary judgment stage and finds that NextEra has provided sufficient evidence to maintain its damages claims for Gas Day 15 through 18.

However, NextEra does not point to, nor can the Court identify, any specific evidence that plausibly supports that NextEra made efforts to purchase replacement gas for Gas Day 19. See Anderson, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). In his declaration, Irwin stated that he "actively and persistently sought to secure gas between February 12 and February 18, 2021," and entered into six daily transactions for delivery on February 18, 2021, all of which is supported by some evidence in the record, but makes no mention of his efforts to secure gas for delivery on February 19, 2021, or Gas Day 19. (See Irwin Decl. ¶¶ 7, 11-12.) Although Cairnes initially stated that NextEra may have attempted to purchase replacement gas on Gas Day 19, upon review of the transaction data, Cairnes concluded that NextEra ultimately did not need to seek replacement gas for Gas Day 19. (See Cairnes Dep. Excerpts at 151:6-25; see also "NextEra Objs. to Macquarie SOMF," Dkt. No. 148 at 1-61, ¶ 93.) As there is no affirmative evidence that NextEra attempted to purchase replacement gas on Gas Day 19, the Court grants Macquarie's motion for summary judgment on the narrow

64

issue of NextEra's claimed spot damages for Gas Day 19 at the OGT Pool.

Thus, for the reasons explained above, Macquarie's motion for summary judgment on NextEra's spot damages is **DENIED** for Gas Days 15 and 16 and is **GRANTED** for Gas Day 19.

  b. *Passing Force Majeure*

Macquarie makes the novel argument that NextEra cannot recover any spot or cover damages for Gas Days 15 through 18 because NextEra fully or partially "passed" Macquarie's Force Majeure downstream on those Gas Days. (<u>See</u> Macquarie Mem. at 23.) Upon receiving a force majeure notice from an upstream supplier, a buyer with supply obligations to downstream counterparties has two general courses of action: (1) the buyer may purchase replacement gas in order to fulfill its obligations to the downstream customers, or (2) the buyer may excuse its obligations by "passing" the force majeure notice to downstream customers, allowing the buyer to cut gas deliveries to its downstream customers that stemmed from the lost gas supply upstream.[18] (<u>See</u> <u>id.</u> at 3, 9–10, 21, 23–24.)

---

[18] During a force majeure, parties generally pass the force majeure notice downstream to avoid increasing the demand and price of the already limited gas supply. <u>See</u> <u>Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade</u>, 706 F.3d 419, 425 (5th Cir. 2013) ("[I]t is practice in the natural gas industry for a seller to simply pass on force majeure if its upstream suppliers have declared force majeure."); <u>LNG Ams., Inc.</u>, 2023 WL 2920940, at *9 ("[O]ne reason that the [natural gas] industry employs Force Majeure provisions is to avoid worsening a crisis by relieving suppliers of [] an obligation to buy limited supplies of gas.").

Macquarie argues that if a buyer passed a Force Majeure notice downstream, such is conclusive evidence that the buyer had no intention of replacing the lost upstream supply. (See id. at 23.) And as applied here, NextEra passed Macquarie's Force Majeure notice to excuse NextEra's corresponding downstream cuts, meaning that NextEra reduced its deliveries to downstream parties by the same amount of gas that Macquarie failed to deliver. (See id. at 23-24.) According to Macquarie, NextEra's corresponding downstream cuts are indicative that NextEra did not intend to replace the gas that Macquarie failed to deliver. (See id.)

At the outset, the Court notes that Macquarie's theory about the implications of passing a force majeure notice is unsupported by any authority. Although Macquarie's position is plausible in the abstract, there is evidence in the record – mainly, the Irwin Declaration and its supporting exhibits - that NextEra made efforts to purchase replacement gas for Gas Days 15 through 18. In light of this evidence, the Court rejects Macquarie's position that passing a Force Majeure notice in this action conclusively shows that a counterparty did not intend to purchase replacement gas.

c.  *Any Gas Purchases Were Not Replacement Gas*

Macquarie posits that even if NextEra made efforts to purchase or actually purchased gas on Gas Days 15 through 18,

NextEra would have made those efforts and purchases regardless of Macquarie's Force Majeure notice. (See Macquarie Mem. at 23-24.) According to Macquarie, the evidence shows that even if Macquarie and all other upstream parties had fulfilled their delivery obligations to NextEra, NextEra would have needed to buy additional gas to meets its downstream obligations because (1) NextEra entered the month of February with a gas deficit, and (2) NextEra had not secured enough gas through its existing contracts to fulfill its on-demand contract with ONG. (See id.)

Unlike the firm transactions between NextEra and Macquarie, which required the parties to deliver a set volume of gas each day, the contract between NextEra and ONG (the "ONG Contract") was less predictable. Pursuant to the ONG Contract, ONG could request up to 165,000 MMBtu per day from NextEra, with one day's notice, and NextEra was required to deliver the requested volume to the OGT Pool the following day. (See Macquarie Mem. at 24; see also Macquarie SOMF ¶ 97.) Before the Storm, ONG requested 50,000 MMBtu per day for Gas Days 6 through 8 and 65,000 MMBtu per day for Gas Days 9 through 11. (See Macquarie Mem. at 24; Macquarie SOMF ¶¶ 98-99.) But during the Storm, ONG's requested volumes sharply increased. On Gas Days 12 through 17, ONG requested the full 165,000 MMBtu per day and on Gas Day 18, ONG requested 115,000

MMBtu. (See Macquarie SOMF ¶ 99.) Macquarie claims that based on NextEra's existing contracts with upstream suppliers, NextEra lacked the supply needed to meet ONG's high-volume requests on Gas Days 12 through 18, regardless of whether Macquarie had met its delivery obligations during the Storm. (See Macquarie Mem. at 24.)

NextEra counters that the evidence shows that (1) NextEra had a surplus of gas at the beginning of February 2021, (2) NextEra had contracted for sufficient volumes of gas to cover its downstream obligations, and (3) NextEra's gas purchases during the Storm were intended to counter upstream supply cuts, including cuts by Macquarie, not merely to meet its obligations to ONG. (See "NextEra Opp'n," Dkt. No. 145 at 24; see also "NextEra SAMF," Dkt. No. 148 at 62-123, ¶¶ 273-76, 279.) Whether NextEra's efforts to purchase gas on the open market were made in response to Macquarie's under-performance or a result of NextEra's failure to secure sufficient gas supply before the Storm is a fact-driven inquiry that cannot be resolved at summary judgment. See cf. Arkansas Okla. Gas Corp. v. BP Energy Co., 642 F. Supp. 3d 802, 807 (W.D. Ark. 2022) (denying cross-motions for summary judgment because whether defendant's supply shortage was due to Winter Storm Uri or defendant's failure to secure firm sources of gas supply prior to Winter Storm Uri turned on

questions of fact to be resolved at trial); see also Arkansas Okla. Gas Corp. v. BP Energy Co., No. 21 Civ. 02073, 2023 WL 3620746, at *7-9 (W.D. Ark. May 24, 2023) (following bench trial, concluding that defendant's business decision not to secure firm sources of gas before Winter Storm Uri contributed to defendant's gas shortage and inability to deliver the full 30,000 MMBtu per day that plaintiff was entitled to request on demand under the contract).

Moreover, whether NextEra's efforts to purchase gas were reasonable and made in good faith turn on factual resolutions that are improper at summary judgment. See Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc., 887 F. Supp. 2d 459, 480 (E.D.N.Y. 2012) (whether plaintiff's cover purchases were made in good faith or reasonable were questions of fact that precluded summary judgment); Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade, No. 06 Civ. 714, 2011 WL 765555, at *9 (S.D. Miss. Feb. 25, 2011) (concluding that "whether the [Plaintiffs] covered" by purchasing or substituting the defendant's gas and "the extent to which [Plaintiffs] were allegedly damaged" were both "question[s] of fact" to be determined at trial).

  d.  *Damages Calculations*

The parties have also submitted competing damages calculations, supported by the expert reports of Kidd and

Broxson. (See Kidd Rep.; Broxson Rep.; Dkt. No. 146-64 (Schedule to Broxson Rep.).) As explained above, there are genuine disputes of material fact surrounding possible breaches of the Agreement by both parties. Given that liability and other damages-related questions are unresolved, the Court declines to decide any further issues of damages at this stage. See Gadre v. Hexanika, Inc., No. 21 Civ. 11221, 2024 WL 4276225, at *5 (S.D.N.Y. Sept. 24, 2024); see also Hudson Techs., Inc. v. RGAS, LLC, 716 F. Supp. 3d 327, 332 (S.D.N.Y. 2024) (denying motion for summary judgment on damages, "as it is premature to decide issues of damages prior to establishing liability"); Lovely H. v. Eggleston, No. 05 Civ. 6920, 2012 WL 4459463, at *2 (S.D.N.Y. Sept. 19, 2012) ("It is axiomatic that summary judgment as to damages can only follow a determination that damages are in fact owed (*i.e.*, that the defendant is actually liable for damages).").

Accordingly, Macquarie's motion for summary judgment on damages is **GRANTED** regarding NextEra's claim for spot damages on Gas Day 19 and is **DENIED** regarding NextEra's remaining damages claims for Gas Days 15, 16, 17, and 18, with those issues of damages to be reserved for resolution following determinations of liability at trial.

## IV.  ORDER

For the reasons explained above, it is hereby

**ORDERED** that the motion for partial summary judgment filed by plaintiff and counterclaim defendant NextEra Energy Marketing, LLC ("NextEra") (Dkt. No. 125) is **DENIED**; it is further

**ORDERED** that the motion for summary judgment filed by defendant and counterclaim plaintiff Macquarie Energy LLC ("Macquarie") (Dkt. No. 118) is **GRANTED** as to NextEra's claimed damages for February 19, 2021 (Gas Day 19) and is **DENIED** as to liability for breach of contract and NextEra's remaining damages claims; and it is further

**ORDERED** that the parties shall submit a joint letter within fourteen (14) days of the date of this Decision and Order indicating (1) the parties' availability for a bench trial in the first quarter of 2026, (2) the anticipated length of trial, and (3) a proposed pretrial schedule in accordance with the Court's Individual Trial Procedures.


**SO ORDERED.**

Dated:      10 September 2025
            New York, New York

_____
            Victor Marrero
            U.S.D.J.